UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

SEP 25 2012

RECEIVED

DC  CCA    DOCKET NO.  10-1130

# UNITED STATES COURT OF APPEALS

# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

## LOIS LOWE,  CARL DELMONT AND ZANDRA RUDO

### PETITIONERS

### V.

## SURFACE TRANSPORTATION BOARD

---

## PETITION FOR REVIEW OF A DECISION OF

## THE SURFACE TRANSPORTATION BOARD

### (Cockeysville Industrial Track)

---

## PETITIONERS'   FINAL  BRIEF

Submitted by:    Lois Lowe, *et. al.* Petitioners,  *pro se*
1941 Greenspring Drive
Timonium, MD 21093
(443) 226-5077

## UNITED STATES COURT OF APPEALS
## DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| **LOIS LOWE, and** | * | |
| **CARL DELMONT, and** | * | **Case No.:   10-1130** |
| **ZANDRA RUDO** | * | |
| **Petitioners** | | |
| | * | |
| **V.** | | |
| | * | |
| **SURFACE TRANSPORTATION** | | |
| **BOARD** | * | **(AB 290 - 311X)** |
| **Respondent** | | **(CIT)** |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*.

### PETITIONERS' BRIEF

## 1. CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 and Local Rule 26.1, Zandra Rudo, Carl Delmont and Lois Lowe, who are the Petitioners ("Party"), make the following disclosure:

1. Is the Party a publicly held corporation or other publicly held entity?   NO
2. Does the Party have any parent corporations?   NO
3. Is 10% or more of the stock of the Party owned by a publicly held corporation or other publicly held entity?   NO
4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   NO
5. Is the Party a trade association?   NO
6. This case does not arise out of a bankruptcy proceeding.

*Lois V. Lowe*
_____    September 24, 2012
Lois Lowe, Petitioner                       Date

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

(A) Parties and Amici:  Parties:   Lois Lowe, Petitioner
Carl Delmont, Petitioner
Zandra Rudo, Petitioner
Surface Transportation Board, Respondent
Department of Justice, Respondent
Maryland Transit Administration, Intervenor.
Norfolk Southern Railway Company Co.,
Intervenor

(B) Rulings under review:   *Norfolk Southern Railway Company – Petition for Exemption – In Baltimore City and Baltimore County, MD,* STB Docket No.  AB-290 (Sub-No.  311X). Served April 5, 2010.

(C) Related cases:  The case on review has not previously been before this court or any other court.  The case on review is not directly related to any other case.

## 2.  TABLE OF CONTENTS

1. Corporate disclosure statement:                                          i

   Certificate as to Parties, Rulings, and Related Cases:                   ii

2. Table of Contents:                                                       ii

3. Table of authorities:

   A.  Table of Cases cited:                                               viii

   B.  Table of Administrative Cases cited:                                 ix

B.  Table of Statutes cited:                                              ix

Glossary of Acronyms:                                                      x

4.  Jurisdictional statements:                                            xi

    A.  Agency's subject-matter jurisdiction:                             xi

    B.  Court of appeal's jurisdiction:                                   xi

    C.  Filing dates:                                                     xi

    D.  Appeal is from a final order:                                     xi

**Appellant's Brief:**

5.  Issues Presented For Review:                                           1

6.  Synopsis of the case:                                                  2

7.  Statement of Facts:                                                    3

8.  Summary of argument:                                                  10

9.  Standing Statement:                                                   11

10.  Argument:                                                            11

11.  The STB's January 29, 2010 Decision NOT striking the Petitioners'
Motion for Protective Order:                                             11

12.  The STB's March 22, 2010 Decision Striking the Petitioners'
Participation and OFA Notices:                                           12

13.  The STB's April 5, 2010 Decision Granting NSR Authority to Abandon
Its Operating Rights and Exempting the Proceeding from the OFA
Procedures:                                                              22

14.  Denial of Due Process, Right to Petition Government and Violation of
42 U.S.C. 1983 Civil Rights:                                             24

15.  OFA Exemption:                                                       25

16.  Assertions of NSR:                                                   26

17.  Assertions of the MTA:                                               28

18. Assertions of the Offerors:                                          30

19. Finding of STB:                                                      31

20. Protesters' Arguments Opposing the STB's April 5, 2010 Findings:     34

21. Need for Continued Rail Service:                                     34

22. Public Use of the Line / Compatibility:                             37

23. Continued Rail Service is Operationally Feasible:                    38

24. Demonstrable Commercial Need for Rail Service:                      39

25. Community Support for Continued Rail Service:                       40

26. The *Utah* Decision [STB AB-33 (Sub-No. 209) Served Jan. 2, 2008]:  40

27. Conclusion – OFA Exemption Opposition:                              43

28. NSR Has Failed to Identify Precisely Where the Abandonment Ends:    46

29. Stranded Segment:   Cockeysville Industrial Park Track aka: Hunt
         Valley Industrial Track:                                       49

30. The MTA Pleadings Do Not Constitute 'Substantial Evidence:'        51

31. Conclusion:                                                         54

16. Certificate of Service:                                            55

    Certificate of Compliance with Rule 32(a):                        55

    Exhibit A   (Verbatim Text of Statutes Cited):                    56

## TABLE OF CONTENTS – APPENDIX

1.  Docket Entries:                                        A - 1 - A

2.  Petition for Review:                                   A - 1 - H

**STB Decisions:**

3.  January 5, 2010 STB Decision:  Notice that Norfolk Southern filed
        a Petition for Exemption to Abandon the Cockeysville Track:   A - 1 - K

iv

4.  Jan. 29, 2010 STB Decision:   Order Granting Petitioners'

    Request for Protective Order:                              A -  4

5.  Feb. 16, 2010 STB Environmental Assessment:              A - 12

6.  Mar. 22, 2010 STB Decision:   Permitted Riffin & Strohmeyer to

    Participate as parties of record.  Denied Lowe, Rudo and Delmont

    permission to participate as parties of record;   Struck Lowe's,

    Rudo's and Delmont's Notices of Intent to File OFA; Riffin

    Barred from making any further filings:                  A - 19

7.  April 5, 2010 STB Decision:   **First notice** that Lowe, Rudo and

    Delmont can participate as parties of record;   Granted exemption

    from OFA;   Shipper letters too speculative, not verified:   A - 24

**FILINGS:**

8.  **Dec. 16, 2009** Norfolk Southern's Petition for Exemption to Abandon

    Cockeysville Industrial Track:                           A - 35

    Petition for Exemption From OFA procedures:              A - 50

    Map of Line:                                             A - 84

    Final System Plan:                                       A - 86

    Environmental Report:                                    A - 101

    Historic Report:                                         A - 113

    Agency Letters:                                          A - 131

9.  **Jan. 5, 2010** Notice of Intent to File OFA, **signed by** Lowe,

    Rudo, Delmont  and Riffin (Strohmeyer by permission):    A - 157

10.  **Jan. 5, 2010** Motion for Protective Order (for Riffin, Lowe,

    Rudo, Delmont):                                          A - 162

Filed under seal:

      Rail Cars to be shipped per year:                  A - 373

      Incinerator:                              A - 374

11.  **Jan. 5, 2010** Comments and Opposition to OFA Exemption:    A - 170

12.  **Jan. 5, 2010** Notice of Intent to Participate as Party of Record **signed by** Riffin, Lowe, Rudo and Delmont):    A - 181

13.  **Jan. 8, 2010** MTA's Objection to Petitioners' Motion for Protective Order:    A - 183

14.  **Jan. 14, 2010** NS's  Objection to Petitioners' Motion for Protective Order:    A - 197

15.  **Jan. 14, 2010** NS's Motion to Strike Lowe, Rudo and Delmont as parties:    A - 222

      To strike notice of intent to file OFA:    A - 231

      To strike Motion for Protective Order:    A - 232

16.  **Jan. 25, 2010** MTA's Support for NS's Petition for Exemption:    A - 237

17.  **Feb. 25, 2010** Reply to Motion to Strike and MTA's Comments:    A - 265

18.  **Feb. 25, 2010** Petitioners' Motion to Amend to add Verification clauses:    A - 277

19.  **Feb. 25, 2010**  Petitioners' Supplement to Material Filed Under Seal:

      **Riffin**   Feb. 23, 2010 Verified Statement re Incinerator:    A - 365

20.  **Mar. 2, 2010**  NS's Opposition to Petitioners' Motion to Amend:    A - 279

21.  **Mar. 4, 2010** MTA's Opposition to Petitioners' Motion to Amend:    A - 291

22.  **Mar. 4, 2010**  Strohmeyer's **2nd Notice** of Intent to Participate:    A - 296

23.  **Mar. 10, 2010** Petitioners' Environmental Comments:    A - 298

24. **Mar. 10, 2010** Petitioners' Reply to NS's and MTA's Reply to

Petitioners' Motion to Amend (by adding Verification clauses): A - 302

Authority of Agent to Sign on Behalf of Principal: A - 303

25. **Mar. 10, 2010** Petitioners' 2nd Supplement to Confidential Info: A - 306

Filed under seal:

**Riffin: Mar. 8, 2010** Verified Statement Recycling tonnage: A - 371

26. **Mar. 26, 2010** Lowe's **2nd Motion** for Protective Order: A - 308

Filed under seal (driver's license, personal financial statement): A - 347

27. **Mar. 26, 2010** Lowe's **2nd Notice** Intent to Participate as Party: A - 310

28. **Mar. 26, 2010** Lowe's **2nd Notice** Intent to File OFA: A - 312

29. **Mar. 26, 2010** Rudo's **2nd Notice** Intent to File OFA: A - 317

30. **Mar. 26, 2010** Rudo's **2nd Notice** Intent to Participate as Party: A - 322

31. **Mar. 26, 2010** Rudo's **2nd  Motion** for Protective Order: A - 324

Filed under seal (driver's license, personal financial statement): A - 349

32. **Mar. 26, 2010** Delmont's **2nd Motion** for Protective Order: A - 326

Filed under seal (driver's license, personal financial statement): A - 351

33. **Mar. 26, 2010** Delmont's **2nd Notice** Intent to File OFA: A - 328

34. **Mar. 26, 2010** Delmont's **2nd Notice** Intent to Participate as Party: A - 333

35. **April 2, 2010:** Strohmeyer **2nd Notice** of Intent to File an OFA: A - 335

2nd Motion for Protective Order: A - 336

36. **April 5, 2010:** Strohmeyer **2nd Notice** Intent to File OFA: A - 339

Strohmeyer Request to toll time to file an OFA: A - 343

37. **April 30, 2010:** Lowe Supplement to Protective Order: A-346-A

Filed under seal:

Cockeysville Rail Line Shippers Coalition letters (2): A - 353

Lowe: April 12, 2010 Verified Statement: A - 355

Packard Fence Verified Statement:                          A - 357

Seal Master Verified Statement:                            A - 359

Cockeysville Coal Company:                                 A - 360

European Landscape and Design Verified Statement:          A - 361

Buschemi Stone Masonry Verified Statement:                 A - 362

Lawn Doctor Verified Statement:                            A - 363

Riffin April 10, 2012 Verified Statement:                  A - 364

### 3. TABLE OF AUTHORITIES

### 3 A. TABLE OF CASES CITED*

* – Authorities upon which Appellant chiefly relies are marked with asterisks.

*Caddo Antoine and Little Missouri R. Co. v. U.S.*, 95 F.3d 740 (8th Cir. 1996): 50

*Clearfield Cheese Co., v. U.S.*, 308 F.Supp. 1072 (W.D.Mo., 1969):          51

*Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197,

    59 S.Ct. 206, 83 L.Ed. 126 (1938):                      51

*Consolidated Rail Corp. v. STB*, 571 F.3d 13 (D.C. Cir. 2009):            46

*Futurex Industries, Inc. v. I.C.C.*, 897 F.2d 866 (7th Cir. 1990):         50

*Jackson v. U.S.*, 428 F.2d 844 (Court of Claims, 1970):                   51

*McKee v. U.S.*, 500 F.2d 525 (Court of Claims, 1974):                     51

*Miranda v. Southern Pacific Transp. Co.*, 710 F.2d 516 (1983):            25

*Roadway Exp. Inc. v. Piper*, 447 U.S. 765, 100 S.Ct. 2455 (1980):         25

*Steadman v. SEC*, 450 U.S. 91, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981):        51

*U.S. v. I.N.S*, 499 F.2d 918 (9th Cir. 1974):                             51

## 3 B.  ADMINISTRATIVE DECISIONS

*Maryland Transit Administration – Petition for Declaratory Order,*
    STB Finance Docket No.  34975 (STB served Sept.  19, 2008):    31

*Union Pacific Railroad Company – **Discontinuance** – in Utah County, Utah,*
    STB Docket No.  AB-33 (Sub-No.  209) (STB served Jan.  2, 2008):    31,40

*\*BNSF Railway Company – Abandonment Exemption – In Kootenai County,*
    *ID*, STB Docket No.  AB-6 (Sub-No.  468X), Served November 27, 2009: 37

*Consolidated Rail Corporation – Abandonment Exemption – In Hudson County,*
    *NJ*, STB Docket No.  AB-167 (Sub-No.  1189X), served April 20, 2010:    48

*\*Norfolk Southern Railway Company - Abandonment Exemption -*
    *In **Orange County**, NY*, FD No.  AB-290 (Sub-No.  283X):    33,35

*\*Norfolk Southern Railway Company – Adverse Abandonment – St.  Joseph*
    *County, IN*, STB Docket No.  AB-290 (Sub-No.  286), Served
    February 13, 2008 ("**Notre Dame**"):    33,35

## 3 C.  TABLE OF STATUTES CITED

5 U.S.C. 556(d):    29,53

16 U.S.C. 1247(d):    42

45 U.S.C. 719(e)(2):    47,48

49 U.S.C. Subtitle IV:    49

49 U.S.C. §10101:    34

49 U.S.C. §10901:    26,49,50

49 U.S.C. §10902:    50

49 U.S.C. §10904:    22,27,34,35,41

| | |
|---|---:|
| 49 U.S.C. §10905: | 41 |
| 49 CFR 1103: | 12,15,16 |
| 49 CFR 1104: | 19,52 |
| 49 CFR 1152.25: | 20 |
| 49 CFR 1152.27: | 9,22 |

# GLOSSARY OF ACRONYMS

BNSF:  BNSF Railway Company

Board:  Surface Transportation Board.

CIT:  Cockeysville Industrial Track

Decision:  *Norfolk Southern Railway Company – Petition for Exemption – In Baltimore City and Baltimore County, MD,* STB Docket No. AB-290 (Sub-No. 311X). Served April 5, 2010.

ICC:  Interstate Commerce Commission.

Line:  That line of railroad which is the subject of: *Norfolk Southern Railway Company – Petition for Exemption – In Baltimore City and Baltimore County, MD,* STB Docket No. AB-290 (Sub-No. 311X). Served April 5, 2010.

MDOT:  Maryland Department of Transportation

MP:  Milepost.

MTA:  Maryland Transit Administration

MSW:  Municipal Solid Waste

NOE:  Notice of exemption.

NS:  Norfolk Southern Railway Company.

NSR:  Norfolk Southern Railway Company.

OFA:    Offer of Financial Assistance.

STB:    Surface Transportation Board.

## 4. JURISDICTIONAL STATEMENTS

### 4 A. AGENCY SUBJECT-MATTER JURISDICTION

49 U.S.C. 10903 grants to the Surface Transportation Board exclusive regulatory authority over rail carrier abandonment proceedings.   This is a rail carrier abandonment proceeding.

### 4 B. COURT OF APPEALS' JURISDICTION

This Petition for Review is pursuant to 28 U.S.C. §§ 2321(a) and 2344, 5 U.S.C. §704, and Rule 15(a) of the Federal Rules of Appellate Procedure, which grant to this Court jurisdiction to review Surface Transportation Board decisions. Venue is proper in this court pursuant to 28 U.S.C. §2343.

### 4 D. FILING DATES

The STB decision being reviewed was served on April 5, 2010.

This Petition was filed on June 2, 2010.

### 4 D. THIS APPEAL IS FROM A FINAL ORDER.

## 5. ISSUES PRESENTED FOR REVIEW

1. Were the Petitioners denied Due Process?

2. Was it arbitrary, capricious or unreasonable for the STB to hold that the Petitioners had not properly 'identified themselves?'

3. Does this proceeding present an issue involving the Final System Plan, which issue must be addressed by the Special Court?

4. Did the abandonment of the CIT leave one or more stranded segments?

5. Was it Congress' intent for Public Use of a railroad right-of-way to prevail over continued rail use of a railroad right-of-way?

6. Was it arbitrary, capricious, unreasonable or unlawful for the STB to find:

    A. That James Riffin ("**Riffin**") was not a shipper on the CIT?

    B. That there was no potential for continued rail service on the CIT?

7. Was it arbitrary, capricious, unreasonable or contrary to law for the Surface Transportation Board ("**STB**") to exempt the abandonment of the Cockeysville Industrial Track ("**CIT**" or "**Line**") from the STB's Offer of Financial Assistance ("**OFA**") regulations?

1

## 6. SYNOPSIS OF CASE

8.  On **December 16, 2009,** Norfolk Southern Railway Company ("NSR") filed a Petition for Exemption ("**Petition**") to abandon its Operating Rights over the Cockeysville Industrial Track, ("**CIT**" or "**Line**") a 14 - mile (+/-) line of railroad originating in Baltimore, MD, and terminating in a northern suburb of Baltimore: Cockeysville, MD.  On **January 5, 2010,** Petitioners filed:   (A) Notices of their intent to participate as parties;  (B) Notices of their intent to file OFAs  to acquire NSR's Operating Rights;  and   (C) Motions for a Protective Order, together with the number of rail cars / year that would be shipped, filed under seal.  The STB arbitrarily, capriciously and unlawfully:   (A) rejected Petitioners Notices of Intent to Participate as Parties, **solely** due to them using the same address of record as Intervenor James Riffin ("**Riffin**"), and   (B) rejected their Notices of Intent to file OFA's and their Motions for Protective Orders, solely due to them authorizing Riffin, for administrative convenience, to sign their pleadings on their behalf .  Ten weeks later, the STB accepted all of these Notices / Motions, simply because the Petitioners used Petitioner Carl Delmont's business address, rather than Riffin's business address.  The STB then, in an **April 5, 2010** decision, held that the Petitioners became Parties of Record on **March 26, 2012,** then granted Norfolk Southern authority to abandon its Operating Rights on the CIT, and further exempted the proceeding from the STB's OFA procedures, **without giving Petitioners any notice or opportunity to file their objections, or to file their OFAs,** in violation of Petitioners' Due Process Rights.  A number of potential shippers on the Line filed verified statements indicating that they desired rail service.  NSR asked the STB to exempt the abandonment from the STB's OFA procedures, arguing that the Line was needed exclusively for a public purpose:

2

The operation of a Light Rail Line. The STB granted NSR authority to abandon its Operating Rights, and further granted NSR's request to exempt the abandonment from the STB's OFA procedures.

## 7. STATEMENT OF FACTS

9. On **April 5, 2010**, A-24, **without any prior notice** to the Petitioners that they had been, on **March 26, 2010**, A-25, granted the right to participate as parties of record, and **without any opportunity to respond**, in violation of petitioners' 1st Amendment Right to "petition the government for a redress of grievances," and in violation of Petitioners' 5th Amendment Right to **not** "be deprived of life, liberty, or property, without due process of law," the STB, in the above entitled proceeding, served a decision granting Norfolk Southern Railway Company ("**NSR**") authority to abandon its operating rights on the Cockeysville Industrial Track ("**CIT**"), A-27, and exempted the proceeding from the Offer of Financial Assistance ("**OFA**") procedures, A-31. The Board's Order stated that the exemptions would become effective on **May 5, 2010**, A-33, and that Petitions to stay had to be filed by April 20, 2010, A-33. Petitions to stay were timely filed, then summarily rejected.

10. On **June 2, 2010,** Petitioners filed their Petitions for Review, A-1-H.

11. On **April 30, 2010,** Intervenor Riffin filed a petition to reopen, which was rejected on **January 27, 2012.**

3

12.  On **December 16, 2009**, Norfolk Southern Railway Company ("**NSR**") filed a Petition for Exemption ("**Petition**") to abandon its Operating Rights over the Cockeysville Industrial Track, a 14 - mile (+/-) line of railroad originating in Baltimore, MD, and terminating in a northern suburb of Baltimore:  Cockeysville, MD, A-35.

13.  On **January 5, 2010**, Lois Lowe ("**Lowe**"),  Zandra Rudo ("**Rudo**")  and Carl Delmont ("**Delmont**")  (collectively, the "**Petitioners**"),  Riffin and Eric Strohmeyer ("**Strohmeyer**") (all five, collectively, the "**Offerors**") filed, **in their individual capacities,** *pro se,*  (A) one Notice of their intent to participate as parties of record ("**Participation Notice**"), A-181;  (B) one Notice of their intent to file OFAs  to acquire NSR's Operating Rights ("**OFA Notice**"), A-157;  and (C) one Motion for a Protective Order ("**Protective Order**"), A-162, which included, under seal, market data showing the minimum number of freight rail cars per year per identified shipper, that would be shipped over the CIT if the Offerors were to become the Operators of the CIT, A-373, and proprietary information regarding an incinerator to be built in Aberdeen, MD, A-374.

14.  For administrative convenience, the Offerors elected to combine their Notices into one Notice, and their Motions, into one Motion.  The Petitioners and Riffin then **individually signed the combined Notice of Intent to Participate,** A-182.  Strohmeyer instructed Riffin to sign his name on his behalf, since Strohmeyer lived in mid-state New Jersey, and could not commute to Maryland in time to sign the Notices / Motions before they were filed, A-297.

4

15.  For administrative convenience, and to protect their personal privacy, the Petitioners elected to use Riffin's business address as the address where they would accept service of process, A-181.  The Petitioners knew that any mail sent to them at Riffin's business address, would be retrieved by Riffin, then brought to them.

16.  In ¶3 of the Participation Notice, A-181, the following statement appears:

> "The Offerors, by signing below, acknowledge and authorize James Riffin to sign on their behalf, all future pleadings or filings associated with this proceeding. Eric Strohmeyer, and all additional participants, will submit separate signature authorizations to the Board."

17.  On **January 5, 2010,** the Offerors, in their individual capacities, *pro se,* filed, for administrative convenience, one combined Notice of Intent to File an Offer of Financial Assistance,  A-157.  The Petitioners and Riffin each **individually signed the Notice of Intent to File an OFA,**  A-160.  At Strohmeyer's direction, A-297, Riffin signed Strohmeyer's name on his behalf,  A-161.

18.  On **January 5, 2010**, the Offerors, *pro se*, in their individual capacities, filed, for administrative convenience, one **Motion for a Protective Order**, A-162, which included, under seal, market data obtained by the Offerors, which market data indicated the quantity of rail cars various shippers would ship on the CIT if the Offerors were to be granted authority to operate the CIT, A-373, and proprietary information the Offerors had developed regarding a proposed Municipal Solid Waste ("**MSW**") incinerator that is to be built in Aberdeen,

5

Maryland, A-374.  For administrative convenience, only Riffin signed the Protective Order.

19.  On **January 5, 2010**, the Offerors filed, *pro se,* in their individual capacities, one (for administrative convenience) **Comments and Opposition to Request for Exemption from the Offer of Financial Assistance Procedures**, A-170.  This Comments / Opposition pleading was **signed individually by Riffin and Delmont.**  For administrative convenience, Riffin, at the direction of Rudo, Lowe and Strohmeyer, signed on their behalf, their respective signatures, A-180.

20.  On **January 8, 2010,** Intervenor Maryland Transit Administration ("**MTA**"), filed its Opposition to the Offerors' Motion for Protective Order, A-183.

21.  On **January 14, 2010,** NSR filed its Objections to Offerors' Motion for Protective Order, A-197.

22.  On **January 14, 2010,** NSR filed a Motion to Strike, A-222, asking the STB to strike the Petitioners' Participation Notice, A-222, their Intent to File an OFA, A-231, and their Motion for a Protective Order, A-232.

23.  On **January 25, 2010,** the MTA filed their Comments supporting NSR's Petition for Exemption, A-237.

24.  On **February 25, 2010,** the Offerors filed their Reply to NSR's Motion to Strike, and their Reply to the MTA's Comments, A-265.

25. On **February 25, 2010**, the Offerors filed a Motion to Amend their **January 5, 2010 Comments**, A-277, by adding a Verification Clause to their Comments, A-278.

26. On **February 25, 2010**, the Offerors filed, under seal, a Supplement to their Protective Order, A-365, which Supplement included a **February 23, 2010** Verified Statement by Riffin detailing proprietary information about the proposed Aberdeen Incinerator, including details about how MSW would be railed, rather than trucked, from the Cockeysville point of origin, to the Aberdeen point of destination.

27. On **March 2, 2010,** NSR filed its Opposition, A-279, to the Offerors' February 25, 2010 Motion to Amend their January 5, 2010 Comments.

28. On **March 4, 2010,** MTA filed its Opposition, A-291, to the Offerors' February 25, 2010 Motion to Amend their January 5, 2010 Comments.

29. On **March 4, 2010,** Strohmeyer filed his **2nd Notice of Intent to Participate as a Party**, A-296, which he signed individually, A-297. He expressly stated, A-297, that he had, for **his** administrative convenience, directed Riffin to sign, on his behalf, the previously filed Participation Notice, Notice of Intent to File an OFA, and Motion for Protective Order.

30. On **March 10, 2010**, the Offerors filed their Comments, A-298, regarding the STB's **February 16, 2010** Environmental Assessment, A-12.

31. On **March 10, 2010**, the Offerors filed their Reply, A-302, to NSR's, A-279, and MTA's, A-291, objections to the Offerors' Motion to Amend, A-277.

32. In Offerors' **March 10, 2010** Reply, the Offerors' detailed Maryland's law with regard to signatures affixed to documents by representatives / proxies of the principal, A-303.

33. On **March 10, 2010**, the Offerors filed a 2nd Supplement, A-306, to their previously filed Confidential Information, which 2nd Supplement included a March 8, 2010 Verified Statement by Riffin regarding recycling tonnage, A-371, which Verified Statement was filed under seal.

34. On **March 26, 2010, Lowe** filed:   (A)  a **2nd Motion** for Protective Order, A-308, which included a copy of her driver's license and personal financial statement, A-347, filed under seal;   (B) a **2nd Participation Notice**, A-310;   and a **2nd Notice of Intent to File an OFA**, A-312, all of which were personally signed by Lowe.

35. On **March 26, 2010, Rudo** filed:   (A)  a **2nd Motion** for Protective Order, A-324, which included a copy of her driver's license and personal financial statement, A-349, filed under seal;   (B) a **2nd Participation Notice**, A-322;   and a **2nd Notice of Intent to File an OFA**, A-317, all of which were personally signed by Rudo.

36. On **March 26, 2010, Delmont** filed:   (A)  a **2nd Motion** for Protective Order, A-326, which included a copy of his driver's license and personal financial

8

statement, A-351, filed under seal;   (B) a 2ⁿᵈ **Participation Notice**, A-333;   and a **2ⁿᵈ Notice of Intent to File an OFA**, A-328, all of which were personally signed by Lowe.

37.  On **April 2, 2010, Strohmeyer** filed his **2ⁿᵈ Notice of Intent to file an OFA**, A-335;   and his **2ⁿᵈ Motion for a Protective Order**, A-336.

38.  On **April 5, 2010**, A-339, **Strohmeyer** filed a Request for 49 CFR 1152.27(a) Information, A-341, and a Request to Toll the Time for Filing an OFA, A-343.

39.  On **April 30, 2010, Riffin** filed a Petition to Reopen the April 5, 2010 STB decision.

40.  On **April 30, 2010, Lowe** filed a Motion to Supplement her previously filed Motion for a Protective Order, A-346-A, wherein she:   (A) Objected to the STB's violation of her 5ᵗʰ Amendment Due Process Rights and her 42 U.S.C. § 1983 Civil Rights, by not permitting her a reasonable opportunity to actually participate as a Party of Record, A-346-B.  Appended to her April 30, 2010 Motion, and filed under seal, were two Cockeysville Rail Line Shippers Coalition letters, dated April 28, 2010 and February 22, 2006, A-353, 354;   and Verified Statements from the following shippers, all of whom desired rail service:   Ms. Lowe, A-355;   Packard Fence, A-357;   Seal Master, A-359;   Cockeysville Coal Company, A-360;   European Landscape and Design, A-361;   Buschemi Stone Masonry, A-362;   Lawn Doctor, A-363;   and Riffin, A-364.

9

41. On **June 2, 2010**, the Petitioners timely filed in the U.S. Court of Appeals, District of Columbia Circuit, their Petition for Review of the STB's April 5, 2010 Decision. Their Petition was assigned Case No. 10-1130.

42. On **June 3, 2010**, Eric Strohmeyer timely filed his Petition for Review. His Petition was docketed Case No. 10-1133.

43. On **June 8, 2010**, the Court consolidated Strohmeyer's Petition for Review with the Petitioners' Petition for Review.

44. On **July 6, 2010**, the STB asked that the Court hold Petitioners' and Strohmeyer's Petitions in abeyance until the STB ruled on Riffin's Petition to Reopen.

45. On **January 27, 2012**, the STB denied Riffin's Petition to Reopen.

46. On **June 21, 2012**, the Court reopened the proceeding, and issued its Scheduling Order.

## 8. SUMMARY OF ARGUMENT

47. The STB denied the Petitioners their Due Process Right to actually participate, by first arbitrarily, capriciously, unreasonably, or unlawfully striking their original pleadings, then by **not** giving them a reasonable time to respond. It was material error for the STB to hold that Riffin was not a shipper in 2009. Norfolk Southern failed to identify the end of the Line of Railroad its seeks to

abandon with sufficient particularity.  Pleadings of Norfolk Southern and the Maryland Transit Administration ("**MTA**") call into question what was conveyed by the Final System Plan, resolution of which may only be made by the Special Court.  The STB's Decision leaves a substantial 'stranded segment:'  The Cockeysville Industrial Park Branch Line.  Exempting the proceeding from the OFA procedures was contrary to statute and Congressional intent.

## 9.  STANDING STATEMENT

48.  The Petitioners, Lowe, Rudo and Delmont, Intervenor Riffin, and Eric Strohmeyer, the ("**Offerors**") are the parties who filed in the underlying proceeding:   (A) Notices to Participate as Parties of Record;   (B)  Notices of Intent to File Offers of Financial Assistance;   (C)   Motions for Protective Orders;  and  (D)  Comments and Arguments against exempting the underlying proceeding from the STB's OFA procedures.  The Petitioners have standing for the April 5, 2010 STB Decision has directly caused them injury, to wit:   The April 5, 2010 STB Decision deprived the Petitioners' of their property right to file an OFA to acquire NSR's CIT Operating Rights.  Their injury is redressable by this Court for this Court has the authority to VACATE the STB's April 5, 2010 Decision, thereby permitting the Petitioners to exercise their right to file an OFA.

## 10.  ARGUMENT

## 11.  THE STB'S JANUARY 29, 2010 DECISION NOT STRIKING THE PETITIONERS' MOTION FOR PROTECTIVE ORDER

49. By a Decision served by the Director of Proceedings on **January 29, 2010**, A-4, the STB made the following comments:

    A.  **Note 1:**  "Riffin purports to represent all the Offerors and possibly others in this filing.  Because Riffin is neither a licensed attorney nor practitioner approved to practice before the Board, he may only represent himself.  See 49 CFR 1103.2 and 1103.3."

    B.  "Riffin's ability to represent others before the Board is addressed in note 1 to this decision and does not require striking the motion for a protective order as to Riffin."  A-5.

    C.  "Accordingly, NSR's motion to strike the request for a protective order **will be denied**."  A-6.  Bold added.

50. **Nowhere** in Petitioners' Participation Notices, A-181, nor in their OFA Notices, A-157, does Riffin "purport[ ] to represent all the Offerors ... ."  Each Offeror **individually signed** the Participation Notice and the OFA Notice.

51. NSR admitted:  "Riffin implicitly acknowledges that he cannot represent the other Offerors ... ."  A-229.

## 12.  THE STB'S MARCH 22, 2010 DECISION STRIKING THE PETITIONERS' PARTICIPATION AND OFA NOTICES

52. By a Decision served by the Director of Proceedings on **March 22, 2010**, A-19, the STB:

A. Struck the Petitioners' Participation Notices, A-21, on the **sole ground** that Petitioners' Participation Notices were not "accompanied by the signer's address." A-21.

B. Struck ¶3 of the Participation Notice,[1] on the sole ground that "Riffin may only represent himself ... ." A-21.

C. Struck the Petitioners' OFA notice, on the sole ground that "the other named individuals [the Petitioners]   have failed to provide sufficient identifying information with the OFA Notice." A-22.

D. Struck ¶5 of the OFA Notice[2]

D. Made the comment:   "This ruling does not preclude any financially responsible person from submitting an offer of financial assistance in this proceeding at the proper time, consistent with the Board's rules." A-22.

E. Made the comment:   "Thus, persons seeking to participate in the OFA process must properly identify themselves." A-22.

53. On **December 16, 2009**, NSR filed an Individual Petition for Exemption to abandon its Operating Rights over the CIT, and to exempt the proceeding from the STB's OFA procedures.

54. On **January 5, 2010**, the Offerors filed:   (A)   Their Participation Notice, A-181;  (B)  Their Notice of Intent to File an OFA, A-157; and   (C)  Their Motion for a Protective Order, A-162, and, under seal, information regarding the number

---

[1]  ¶3 states that Riffin is authorized to sign all future pleadings or filings associated with the underlying proceeding on behalf of the named individuals.

[2]  ¶5 states that Riffin is authorized to sign all future pleadings or filings associated with the underlying proceeding on behalf of the named individuals.

of rail cars that would be shipped on the CIT, A-373, and information regarding a Municipal Solid Waste Incinerator to be built in Aberdeen, MD, A-374.

55. The Offerors desire to jointly obtain, each in their individual capacity, NSR's Operating Rights over the CIT.   Since the Offerors desire to jointly obtain NSR's Operating Rights, the Offerors felt that it would be better to submit joint, consolidated pleadings,  rather than five nearly identical pleadings, each time a pleading needed to be filed.  The Offerors also desired to reduce their copying and mailing expenses, and desired to protect their personal privacy.[3]  Submitting one jointly-filed, but individually signed pleading, would reduce their expenses,  so they decided to submit jointly-filed, consolidated pleadings, individually signed.

56. The Offerors expected the STB to handle this abandonment proceeding expeditiously, due to previous litigation.[4]

---

[3] All pleadings before the STB are easily viewable by the general public by going to the STB's web site.  The Petitioners are acutely aware that many non-participants routinely monitor, and make, on web 'chat rooms,'  derisive comments about pleadings submitted by Riffin and Strohmeyer, some of which have encouraged offensive / unlawful retaliation.  These 'commenters' use 'handles,' (made-up names) to hide their true identity, which makes it nigh impossible to enjoin these 'commenters' from making offensive / unlawful comments.   Two of the Petitioners are women, who must be more careful about putting personal information on the web.  **To protect their personal privacy**, the Petitioners elected to use Riffin's business address as the address where they would receive service of process.   When they submitted copies of their driver's licenses, they expressly asked the STB **not** to put a copy of their driver's licenses on the public portion of the STB's web site.

[4] The speed with which this proceeding was concluded shocked even the Offerors, for this proceeding was concluded in less than 5 months, a new record for disposing of a highly controversial abandonment proceeding.  The Petitioners

57.  The Petitioners and Riffin live in Maryland.  Strohmeyer lives in Central New Jersey.   In order to meet the expected expedited schedule, the Offerors decided, for their Administrative convenience, and to further ensure pleadings would be timely filed, to authorize Riffin to sign their individual names on the Petitioners' behalf. See:   ¶5, A-160 and ¶3, A-181.

58.  Petitioners were aware that non-STB-practitioners are not permitted to represent anyone other than him/her self.  'Representation' by a STB practioner is pursuant to a principal / agent relationship.  The distinguishing feature of an agency relationship, is that the agent **signs his / her own name to a document**. Practitioners before the STB must not only sign **their own name,** but also must disclose the principal that he/she is representing.  49 CFR 1103.4.

59.  The Petitioners researched Maryland law governing a person signing another person's signature on a document.  If one is not authorized to sign another person's signature, it is forgery, a crime.

60.  § 3-401 of the Uniform Commercial Code states:

> "Section 3-401.  Signature
> (1) No person is liable on an instrument unless his signature appears
>     thereon.
> (2) A signature is made by use of any name, including any trade or assumed
>     name, upon an instrument, or by any word or mark used in lieu of a
>     written signature.

---

argue that this record-fast conclusion came at the expense of their Due Process Rights to have 'notice' and a 'reasonable opportunity to respond.'

"Section 3-403.  Signature by authorized representative.

(1) A signature may be made by an agent or other representative, and his authority to make it may be established as in other cases of representation.  No particular form of appointment is necessary to establish such authority."

61.  It was, and still is, the Petitioners' belief that having Riffin sign **their name** on **their** pleadings, **does not** constitute 'representation' as defined in the STB's regulations.  The only STB regulation that the Petitioners could find on this subject, is 49 CFR 1103.4, which states:

"**1103.4 Initial appearances.**  Practitioners shall file a declaration that they are authorized to represent the particular party on whose behalf they appear at the time of making an initial appearance, in all proceedings.  This requirement can be met by:
   (a) Entering the **practitioner's name as the representative** of an applicant in the appropriate space on an application form;
   (b) Signing any complaint, petition, protest, reply or other pleading with a designation following **the practitioner's signature** that he is the representative of a party;
   (c) Entering an appearance at any hearing on the form provided;  or
   (d) Filing a letter with the Secretary of the Board stating that practitioner is authorized to represent a party.  The party represented, their address, and the docket number of the proceeding must also be identified at the time of the initial appearance."  Bold added.

62.  At no time did Riffin ever indicate that he was signing any pleading as the representative of anyone other than himself.  At no time did Riffin sign **his name** on any pleading, for the purpose of binding any of the Petitioners.  Riffin **always signed each Petitioner's name**, following by the notation, "by JR," to indicate that he was affixing each Petitioner's name to the document, **not as the agent of the Petitioner**, but purely for the administrative convenience of the individual

16

Petitioner.  Since Riffin had access to printing and copying machines, and since the STB's regulations require 10 copies of each pleading be submitted to the STB, the Offerors decided to have Riffin perform the administrative task of printing and copying each pleading.  And since these documents often did not get completed until the day they were due, it would have been an administrative nightmare to take each document to all five Offerors for their individual signature.  And rather than habitually late-file their pleadings, due to insufficient time to get each Offerors' individual signature on the document, the Offerors decided to authorize Riffin to sign their individual names on the final version of the document, just before it was copied.   The fact that the Offerors authorized Riffin to sign their individual names on each document on their behalf, was disclosed on their first two pleadings:   In ¶3 of their Participation Notice, A-181, and in ¶5 of their Notice of Intent to file an OFA, A-160.  It should be noted that these first two documents were individually signed by each of the Petitioners.

63.  NSR, A-222,  and the MTA, A-265,  both filed objections to Petitioners' Participation Notices, Petitioners' Notice of Intent to File an OFA, and Petitioners' Motion for a Protective Order.

64.  NSR admitted:   "Riffin implicitly acknowledges that he cannot represent the other Offerors ... ."  A-229.

65. NSR's and MTA's first objection, was that the Petitioners had elected to use Riffin's business address as the address where they desired to be served.  On p.5 of NSR's Motion to Strike, A-226, NSR stated:

17

"The four other persons are identified solely by name. No address is provided and no company association listed.

It appears from this document alone as if the individual 'Offerors' or 'Protestants' intend to participate in their individual capacities. If this is the case, then the Participation Notice of Intent should be stricken from the record except as to Riffin, the only person sufficiently identified on the public record. See 49 C.F.R. 1104.1(b) ('The address of the person filing the pleading should be included on the first page of the pleading.') **[It was,** see A-181.] and 49 C.F.R. 1104.4(b) ('The original of each document not signed by a practitioner or attorney must be ... (2) Accompanied by the signer's address ...'). **[It was,** see A-181. For subsequent documents, neither Riffin nor the Petitioners printed their address under their signature blocks, **without objection by NSR, MTA or the STB.**[5] An objection not raised, is waived.] See also, 49 C.F.R. 1112.4(b) (a petition to intervene must identify the petitioner's interest in the proceeding), **[not relevant in the underlying proceeding]**, 49 C.F.R. 1112.8 (the capacity of the person(s) signing a pleading must be indicated), **[it always was]**, and 49 C.F.R. 1104.12 (requiring service to be made on all Parties unless represented by a practitioner or attorney, in which case service upon the practitioner or attorney is sufficient). **[Not relevant.** The Petitioners always served their pleadings on NSR and MTA. Because they jointly filed their pleadings, and individually signed each pleading, either personally or via Riffin, there was no need to certify that they served their own pleading on themselves.] The reason for the Board's requirements are obvious – due process and the proper functioning of the administrative procedure requires all parties to be able to understand who is participating, in part to understand both the context in which the pleadings are made and to gauge the credibility of allegations therein. **[Who is participating: the five identified Offerors.** Pretty simple to understand that.]

---

[5] Riffin stated that he was not aware of this rule prior to this pleading by NSR. Riffin has literally filed thousands of pleadings before the STB, and hundreds of pleadings involving NSR and the MTA. Riffin **has never** put his address under his signature block. Neither the MTA, NSR nor the STB **has ever** objected to Riffin's failure to put his address under his signature block. It is well known appellate law that an objection not raised, is waived.

Of course, read in the context of the OFA Notice of Intent, the Comments and the Motion for Protective Order, it is possible that these individuals actually intend to act in some manner as a collective to jointly purchase certain rights and agreements now held by NSR. See, e.g. OFA Notice of Intent at Paragraph 1. If this is the case, then the identification of the collective and their association – that is, the identification of the 'person' actually submitting the pleading – is necessary. This is particularly true in the case of an offer of financial assistance, where the Board is tasked to determine whether the 'person' submitting the pleading is a 'financially responsible person' under the statute."  **[Answer:**  The Offerors thought that they made it quite clear that they were 'collectively,' and in their respective 'individual capacities' (they only listed their individual names, not a separate legal entity) giving their Participation notice, A-181, and would be offering to purchase NSR's CIT Operating Rights 'collectively,' and in their individual capacities (they only listed their individual names, not a separate legal entity), A-157. Evidently it was clear enough that NSR admitted "that these individuals actually intend to act in some manner as a collective to jointly purchase certain rights and agreements now held by NSR." A-227.]

66. The STB stated that the Petitioners "have failed to provide sufficient identifying information with the OFA Notice." A-22. The STB's regulations **do not address** what 'identifying information' is required, nor to Petitioners' knowledge, has a STB or ICC decision ever indicated precisely what 'identifying information' is required.

67. 49 CFR 1104.1 (b) merely states:  "The address of the person filing the pleading **should**  [**not 'shall'**]  be included on the first page of the pleading." Bold added.  There is no specification as to what 'address of the person filing the pleading' is acceptable:  the person's business address?  Residence?  Domicile? Where they get their mail, such as a post office box?

19

68. 49 CFR 1152.25, "Participation in abandonment or discontinuance proceedings," likewise offers little insight, for 49 CFR 1152.25(i) merely states: "Protestant's name, address and business." Once again, which address a 'protestant' must / can use, is not specified (business, residence, domicile, P.O. Box). If the protestant is not engaged in a 'business,' the regulation **does not state** that one must state: 'Not engaged in business.'   It merely states that **if** one has a business, then that business needs to be specified   [Presumably to determine whether the protestant has any standing to protest (what is the protestant's interest in the line being abandoned?)].   In the underlying proceeding, the Petitioners **did** state the nature of their business:   They desired to acquire the Operating Rights that NSR was attempting to abandon, so that rail service to Cockeysville would continue to be available.

69. As previously stated, the Petitioners did not want to disclose their place of residence, in order to protect their privacy.  Only Delmont had a business address. Lowe and Rudo, both single females, adamantly did not want the address of their residence in the STB's very public web site.  And some address must be listed in the public docket.  So they asked Riffin if they could get their STB-related mail at Riffin's business address.  He consented.  Since Delmont is not at his Cockeysville address on a daily basis, he too desired to use an address where someone would daily retrieve his mail, and let him know he had mail.  So all three Petitioners listed their address as being 1941 Green Spring Drive, Timonium, MD.  It was a legitimate address.  Riffin informed his letter carrier that they would be getting mail at 1941 Green Spring Drive.  There did not appear to be any reason why they should give a detailed explanation as to why they elected to get their mail at 1941 Green Spring Drive.

70.  And then the STB issued its March 22, 2010 decision, wherein the STB stated that by using the 1941 Green Spring Drive address, the Petitioners had somehow (it was never explained how) failed to 'property identify themselves.' There was no suggestion, or even a hint, as to **how one would 'properly identify themself.'** So Riffin called Joe Dettmar, the Assistant Director of Proceedings and asked, does the STB want a copy of the Petitioners' driver's licenses? **Mr. Dettmar said no.** Mr. Dettmar was given the telephone number of each Petitoner. (The STB's regulation **do not** require that one provide the STB with their telephone number.)  Mr. Dettmar called each Petitioner.  Each Petitioner asked Mr. Dettmar if he wanted him / her to provide the STB with a copy of their driver's license.  Mr. Dettmar said 'no.'

71.  The Petitioners deduced that the real problem was that the STB had arbitrarily, capriciously, unreasonably, and / or unlawfully, decided that the STB would not permit them to use Riffin's business address.  The Petitioners' could use any address, except Riffin's business address.  So they all switched to Delmont's business address.  Now Riffin had to go to Delmont's place of business on a regular basis, to get whatever mail was sent to the Petitioners at that address.  It was very inconvenient.  And frequently, the Petitioners did not timely get their mail (on those occasions when Riffin did not daily visit Delmont's business address).

72.  And lo and behold, according to the STB's April 5, 2010 decision, the Petitioners, by simply using another address, miraculously had properly 'identified' themselves, and had been given authority, effective March 26, 2010, A-25, to participate as parties of record.

### 13.  THE STB'S APRIL 5, 2010 DECISION GRANTING NSR AUTHORITY TO ABANDON ITS OPERATING RIGHTS AND EXEMPTING THE PROCEEDING FROM THE OFA PROCEDURES

73.  On **April 5, 2010**, the STB granted NSR authority to abandon its Operating Rights on the CIT and further exempted the proceeding from the STB's OFA procedures, codified in 49 U.S.C. 10904 and 49 CFR 1152.27.

74.  In ¶6, A-172, of the Offerors Comments and Opposition to Request for Exemption from the Offer of Financial Assistance Procedures ("**Comments**"), the Offerors stated:

> "The Offerors do not object to NSR's abandonment of its operating rights on the CIT, **providing the Board permits the Offerors to acquire those operating rights, then continue to provide freight rail service on the Line.  The Offerors STRONGLY OPPOSE the loss of freight rail service on the CIT.**"

75.  In the April 5, 2010 Decision, at A-25, the STB noted that the Petitioners had filed Amended Participation Notices and Amended OFA Notices, and based on those amended Notices, the STB held that "Rudo, Delmont, and Lowe all provided sufficient information to become parties to this proceeding on **March 26, 2010**." A-25.  Bold added.

76.  The Petitioners would ask that the Court **compare:**

22

A.  Lowe's January 5, 2010, at A-181, and March 26, 2010, at A-310, Participation Notices;

B.  Lowe's January 5, 2010, at A-157, and March 26, 2010, at A-312, OFA Notices;

C.  Rudo's January 5, 2010, at A-181, and March 26, 2010, at A-322, Participation Notices;

D.  Rudo's January 5, 2010, at A-157, and March 26, 2010, at A-317, OFA Notices;

E.  Delmont's January 5, 2010, at A-181, and March 26, 2010, at A-333, Participation Notices;

F.  Delmont's January 5, 2010, at A-157, and March 26, 2010, at A-328, OFA Notices.

77.  The **only** significant difference between the two Participation Notices for each Petitioner, **was the change of address**.  And the **only** significant difference between the two OFA Notices for each Petitioner, **was the change of address**.

78.  Given that the **only** significant difference between Petitioners' first and second Notices, was their change of address from Riffin's business address to Delmont's business address, it obviously was totally arbitrary, capricious, unreasonable, and / or unlawful, for the STB to deny the Petitioners' first Notices,

23

then accept the Petitioners' second notices.

## 14.  DENIAL OF DUE PROCESS, RIGHT TO PETITION GOVERNMENT AND VIOLATION OF 42 U.S.C. 1983 CIVIL RIGHTS

79.  The 1st Amendment to the U.S. Government states:

> "Congress shall make no law ... abridging ... the right of the people ... to petition the Government for a redress of grievances.

80.  The STB, by arbitrarily, capriciously, unreasonable, or unlawfully striking Petitioners' January 5, 2010 Participation Notices and January 5, 2010 OFA Notices, deprived the Petitioners' of their 1st Amendment right "to petition the government for a redress of grievances."

81.  The 5th Amendment to the U.S. Constitution states:

> "No person shall ... be deprived of life, liberty, or property, without due process of law;   nor shall private property be taken for public use, without just compensation."

82.  42 U.S.C. §1983 states:

**"§ 1983.  Civil action for deprivation of rights.**

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the **deprivation of any rights, privileges, or immunities secured by the Constitution and law, shall be**

24

**liable to the party injured in an** action at law, suit in equity, or **other proper proceeding for redress,** except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."

83.  Due Process requires, at a minimum, that there must be notice and an opportunity to respond. *Miranda v. Southern Pacific Transp. Co.,* 710 F.2d 516, 522-23 (1983), *Roadway Exp. Inc. v. Piper,* 447 U.S. 765, 767, 100 S.Ct. 2455, 2465 (1980).

84.  The STB, unbeknownst to the Petitioners, on **March 26, 2010,** held that "Rudo, Delmont, and Lowe all provided sufficient information to become parties to this proceeding on **March 26, 2010.**" A-25.  For reasons unknown, the STB **waited until April 5, 2010 to notify the Petitioners that they could participate! And on that same day,** granted NSR authority to abandon its Operating Rights, and granted NSR's motion to exempt the proceeding from the STB's OFA procedures, **thereby abridging Petitioners' 1st Amendment right to 'petition the Government for a redress of grievances,' abridging Petitioners' 5th Amendment right to Due Process [depriving them of a valuable property right (the right to file an OFA and the right to protest exempting the proceeding from the OFA procedures) without adequate notice, and a reasonable time to respond], and abridging the Petitioners' 42 U.S.C. §1983 Civil Rights.**

### 15.  OFA  EXEMPTION

## 16. ASSERTIONS OF NSR

85. In its **Petition**, NSR asserted the following:

A. "The Maryland Transit Administration (MTA) owns the entire Line over which NSR will abandon the freight service operating rights and operations." Petition at 7. A-41.

B. The "MTA's 1990 acquisition of the CIT did not require agency (ICC) authorization under 49 U.S.C. §10901 and that MTA did not acquire a common carrier obligation by virtue of its acquisition of the CIT in 1990 or transactions it has taken since that time." Petition at 8. A-42.

C. "MTA currently operates passenger rail transit service over most of the Line. MTA's passenger rail transit operation over the Line extends to the wye track just north of Warren Road, **near Milepost UU-13**, at which the Hunt Valley Extension springs from the CIT main line." Petition at 8-9. A-42-43. Emphasis added.

D. "NSR freight service operations over the Line ceased in April 2005, active shippers on the Line at that time have been using alternative transportation services for over four years and have agreed with MTA to continue using such services, no railroad customer who has received service over the Line has filed a formal complaint concerning lack of service on the Line, there has been no reasonable request for rail freight service over the Line by or on behalf of an actual railroad customer located along the Line in the period since April 2005 and the Line is now heavily used for passenger rail transit operations. There is no reasonable prospect that a sufficient volume of traffic could be attracted and definitely committed to use restored rail service over the Line for NSR (or any railroad freight service operator) to be able to operate freight service over the Line at a profit. Thus, there is no need for future rail freight service over the Line." Petition at 13-14. A-47-48.

E. "Whether or not the title to any of the property on which the Line is located is subject to any reversionary interest is not relevant in this proceeding. The Line's right-of-way is already owned or lawfully used

26

under easements for railroad purposes by MDOT for MTA's passenger rail transit operations." Petition at 17. A-51.

F. "NSR states that if OFA information concerning ownership or valuation of the Line's right-of-way or other property was requested, NSR could only respond that MTA, not NSR, owns the right-of-way, including all real estate held in fee, and the track and materials that comprise the Line. NSR can not convey the Line's right-of-way or material to an offeror. Therefore, NSR can not provide a minimum purchase price for the Line or the supporting valuation information." Petition at 29. A-63.

G. "NSR can not estimate the value of the freight operating easement, freight service operating rights and freight service operations on the Line or the compensation that should be **paid to MTA** for such easement, rights and operations by a third party." Petition at 30. A.64. Emphasis added.

H. "NSR does not maintain the Line." Petition at 30. A-64.

I. "NSR surmises that only minor rehabilitation of the Line and restoration and reconnection of switches would be required to perform freight service over the Line and to ancillary tracks ... ." Petition at 30. A-64.

86. NSR requested that the Board "exempt the abandonment of NSR's freight service operating rights and its freight service operations over the Line from the provisions of 49 U.S.C. §10904." Petition at 32. A-66.

87. **In support of its request to exempt the proceeding from the OFA procedures**, NSR asserted the following:

A. No traffic has moved over the Line since April, 2005. Petition at 32. A-66.

B. "[T]there has not been a reasonable request for rail service from a customer on the Line since that date [April, 2005]." Petition at 32. A-66.

C. "Moreover, there is no reasonable prospect that any definite amount of freight traffic would move over the Line in the future, much less a sufficient amount of definite future freight traffic to operate freight service over the Line at a profit." P. at 33. A-67.

D. "There has been no freight service over the Line for well over four years, former customers have committed to and agreed to use alternative transportation services, no other definite potential freight service customers have committed to or are likely to commit to use of rail service over the Line in volumes and at rates or revenues sufficient to operate the service profitably. Thus, there is no demand or need for future freight service over the Line." Petition at 35-36. A-69-70.

## 17. ASSERTIONS OF THE MTA

88. On **January 25, 2010**, the Maryland Transit Administration ("**MTA**") filed a Reply of the MTA in Support of Petition for Exemption ("**MTA Reply**"). In its MTA Reply, the MTA corroborated the assertions made by NSR regarding ownership / use of the Line for commuter rail service / and MTA's double-tracking and maintenance of the Line. On p. 4 of the MTA Reply, Counsel for the MTA made the following corroborated assertions:

A. "Scheduled light rail service operates between 6:00 am and 11:00 pm, Monday-Saturday, and between 11:00 am and 7:00 pm on Sundays;" A-242.

B. "In 2008, the latest year for which data are publicly available, light rail weekday boardings averaged 25,754 passengers for regularly scheduled service." A-242.

89. Counsel for the MTA made the following **uncorroborated** statements: "[I]ncreased demand for light rail service compelled MTA to take steps to (1) increase capacity on the Line for light rail traffic and (2) **reduce actual and potential temporal conflicts between freight traffic and light rail traffic**. Accordingly, MTA double-tracked the entire segment of the Line from North Avenue  [Milepost 0.5] to just north of Warren Road in Baltimore County, [Milepost 13.0]  where the light rail line leaves the subject right-of-way, to allow for simultaneous two-way traffic over the Line." MTA Reply at 3. A-241. "[L]ight rail trains also need access to the track during non-service hours for staging and other purposes." MTA Reply at 4. A-242. (Emphasis added.)

90. On p. 2 of the MTA Reply, A-240, **Counsel** for the MTA also made three bald allegations that were **unsupported, unsubstantiated, and unverified,** which statements formed the **sole basis** for the Board's decision to exempt the proceeding from the OFA procedures, in contravention of the Administrative Procedures Act, 5 U.S.C. 556:

   A. "MTA asserts that the abandonment and associated exemptions are critical to ensure the future safety and success of the light rail transit system it operates over the Line." Op. at 2-3. A-25-26.  MTA Reply at 2.  A-240.

   B. "MTA states that there has been no freight traffic on the Line, or any reasonable request for freight rail service, since April 2005, and that there is no credible or reasonable prospect of future demand for such service." Op. at 3. A-26. MTA Reply at 2.  A-240.

   C. "In addition, MTA asserts that, as demand for freight rail services has decreased over the Line, demand for passenger light rail service on the Line has increased, thus compelling MTA to double-track the entire Line

29

while working to reduce actual and potential conflicts with freight traffic." Op. at 3. A-26. MTA Reply at 3. A-241.

91. "MTA asks the Board to grant NSR's petition for exemption, based on the lack of demand for freight rail service and the valid and compelling public purpose the Line is serving." Op. at 3. A-26. MTA Reply at 17. A-255.

## 18. ASSERTIONS OF THE OFFERORS

92. The Board acknowledged the following assertions made by Riffin, all of which were **supported by sworn affidavits**:

A. "Riffin disputes NSR's claim that future freight traffic would not generate sufficient revenue to cover the costs of resuming freight service on the Line." Op. at 3. A-26.

B. "Riffin also claims that the reason there has been no freight rail traffic over the Line since 2005 is because MTA removed most the the track infrastructure and effectively took the Line out of service in April 2005 in order to facilitate its double-tracking project." Op. at 3. A-26.

C. "Riffin argues that his acquisition of NSR's freight operating rights would not interfere with MTA's current or planned transit services." Op. at 3. A-26.

D. "Riffin contends that he has made reasonable requests for freight service, but that NSR improperly denied them as unreasonable." Op. at 3. A-26.

E. "Riffin also states that a number of other shippers desire freight rail service in Cockeysville. In support of his claims, Riffin submits as confidential information a listing of what he describes as potential shippers and their projected need for freight rail service in Cockeysville,

in addition to other information." Op. at 3. A-26.

F. "Riffin states that, without freight rail service on the Line, the proposed incinerator will result in the transport by motor carrier of 365,000 tons of MSW to Harford County, thus doubling the number of trucks on Route 152 to 27,000 per year." Op. at 3-4. A-26-27.

G. "Riffin further claims to have submitted a proposal for the transportation of an average of 13 rail cars per day of MSW from Cockeysville to the Harford County incinerator over the Line, between the hours of midnight and 5 am." Op. at 4. A-27.

## 19. FINDINGS OF STB

93. The STB made the following findings regarding NSR's request for authority to **abandon its operating rights** on the Line:

A. "Here, the record evidence does not show any current need, or any credible, nonspeculative future need, for freight service on the line." Op. at 4. A-27.

B. "There are no **current** freight railroad customers using the Line. Fn 3: The Board previously has assessed Riffin's claim that NSR failed to serve him and has determined that Riffin is not a shipper on the CIT. *Maryland Transit Administration – Petition for Declaratory Order,* STB Finance Docket No. 34975 (STB served **Sept. 19, 2008**). Riffin's restatement of the same allegations here does not warrant revisiting that determination." Op. at 4. A-27. (Emphasis added.)

C. "The three former shippers on the Line have shifted their traffic to alternate transportation services." Op. at 4. A-27.

D. "Riffin's forecasts for potential freight rail traffic on the CIT are too speculative to be given any significant weight. In *Union Pacific Railroad Company – Discontinuance – in Utah County, Utah*, STB Docket No. AB-33 (Sub-No. 209), slip op. at 2-3 (STB served Jan. 2,

31

2008) (*Utah County*), the Board declined to consider a potential shipper's traffic projections because that party had not taken the basic step of **contacting the carrier about rates and terms of service**, nor had it provided contracts **or otherwise demonstrated that the traffic would be likely in the coming year**. Here, Riffin's showing is even weaker: he has failed to submit any verified statements or other evidence from shippers requesting freight rail service or demonstrating a need for such service in the future. Rather, Riffin's only evidence of potential traffic consists of his unsubstantiated statements. We find this evidence to be insufficient." Op. at 4. A-27. (Emphasis added.)

E. "In short, as was the case in *Utah County*, there simply is no evidence before us in this case of any commitment or **affirmative acts by actual or potential shippers** to secure rail service over the Line. As a result, we find that the potential future traffic claimed by Riffin is too speculative to be entitled to much weight." Op. at 5. A-28. (Emphasis added.)

94. The STB made the following findings regarding NSR's request for authority **to exempt the proceeding from the OFA procedures**:

A. "Here, NSR has established that the Line is currently used for a valid public purpose by MTA, as a passenger rail transit line." Op. at 6. A-29.

B. "MTA has asserted on this record that the abandonment of freight rail service is critical to ensuring the future safety and success of the light rail transit system MTA operates over the Line." Op. at 6. A-29.

C. "MTA explains that it has worked to reduce actual and potential conflicts with freight traffic to ensure that the increased demand for light rail service on the Line is safely met." Op. at 6. A-29.

D. "The Board has received **no request from a** former shipper or **potential shipper** indicating a commercial need for freight rail service over the Line." Op. at 6. A-29. (Emphasis added.)

32

E. "However, given the short distances involved, the fact that the MSW movements **necessarily originate on trucks**, and the fact that **a rail interchange would be needed to complete the delivery of the MSW to the potential incinerator**, which if located on a rail line, **would be on a different rail line**, we have serious questions about the **feasibility of an operation transloading the MSW from trucks to rail here**. A-29-30. (Emphasis added.)

F. "Given the testimony of MTA and Baltimore County, we require a stronger showing than Riffin has made that rail service to the proposed incinerator would serve a real public need and that **such service would not compromise the safety of the continued use of the tracks for public transit, an important consideration here**." A-30. (Emphasis added.)

G. "More importantly, in that case  [*Norfolk Southern Railway Company – Adverse Abandonment – St. Joseph County, IN*, STB Docket No. AB-29- (Sub-No. 286) (STB served Feb. 14, 2008)],  the Board was persuaded that there was a real potential for rail service:  Notre Dame University, a former shipper of coal on the line, continued to receive 80,000 tons of coal annually by motor carrier and was expected to increase its use to 100,000 tons annually in the near future;  coal is a commodity that can be moved more efficiently by rail than by truck;  and although Notre Dame **had withdrawn its initial support for a plan to reactivate the line, it LATER** indicated that it **MIGHT CONSIDER** resuming using rail service for its coal deliveries.  The record here reveals no similar evidence of a potential demand for the renewal of freight rail service." Op. at 7. A-30. (Emphasis added.)

H. "Riffin also quotes a lengthy passage from *Norfolk Southern Railway Company –Abandonment Exemption – In Orange County, NY*, STB Docket No. AB-290 (Sub-No. 283X) (STB served May 2, 2007) (*Orange County*)  to suggest that his mere expression of interest in providing rail service on the Line suffices to prevent the Board from granting an OFA exemption. In quoting *Orange County*, Riffin omits the Board's finding that, in that case, 'the petition for abandonment is not tied to a public project.' Here, in contrast, NSR's petition *is* tied to a public project, MTA's light rail commuter passenger system." Op.  at 7-

33

8. A-30-31. Emphasis in original.

I. "Applying OFA provisions in this instance is not necessary to carry out the rail transportation policy. Allowing the abandonment exemption to become effective expeditiously, without first being subject to these provisions, will minimize the need for Federal regulatory control over the rail transportation system, expedite the regulatory decision, and reduce regulatory barriers to exit   [49 U.S.C. 10101(2) and (7)]. Regulation is not necessary to protect shippers from an abuse of market power, because there are no current shippers on the Line and no potential shippers have objected to the exemption from the OFA process." A-31.

## 20. PROTESTERS' ARGUMENTS OPPOSING THE STB'S APRIL 5, 2010 FINDINGS

## 21. NEED FOR CONTINUED RAIL SERVICE

95. The Offerors provided the STB with their arguments regarding why the CIT was needed for continued rail service, why they opposed exempting the proceeding from the STB's OFA procedures, and why continued use of the CIT for freight rail purposes, would benefit a considerable number of freight rail shippers, and **would not** unduly interfere with the MTA's public use of the Line for commuter Light Rail purposes. For the convenience of the Court, the Petitioners will reiterate the arguments they presented in their   Comments and Opposition to Request for Exemption from the Offer of Financial Assistance Procedures, A-170.

96. The primary purpose of the OFA procedures is to provide a means by which a rail line that is needed for continued rail service, can be saved. Congress, in enacting 49 U.S.C. 10904, has indicated that there is a strong Congressional

34

desire to preserve rail lines when someone expresses a desire to save a line proposed for abandonment. The 'need for continued rail service' criteria is ill defined. The mere fact that someone has offered to buy a line proposed for abandonment, without any showing of potential rail traffic, has been held to be sufficient. See: *Norfolk Southern Railway Company – Abandonment Exemption – In Orange County, NY,* STB Docket No. AB-290 (Sub-No. 283X) (STB served May 2, 2007), where the STB stated:

> "The OFA provisions - which permit a party genuinely interested in providing continued rail service to acquire a line for that purpose over the objections of the owner - reflect a Congressional intent that rail service be preserved whenever possible. While exemptions from 49 U.S.C. 10904 have been granted from time to time, they have been granted when the right-of-way is needed for an overriding public purpose (footnote 3) or an important private undertaking (footnote 4), and there is no apparent interest in continued rail service (footnote 5). ... Mr Riffin has shown an interest in providing continued rail service, despite the absence of an active shipper on the line for almost 2 years. Accordingly, the Board finds no basis for undercutting the Congressional objective of maintaining rail service, despite the fact that the prospects for a successful OFA are marginal." ¶17, A-176.

97. More recently, in *Norfolk Southern Railway Company - Adverse Abandonment - St. Joseph County, IN,* FD No. AB-290 (Sub-No. 286X) ("*Notre Dame*"), Served February 13, 2008, the STB stated:

> "Applicants claim that there has been no rail service on the lines or requests for rail service for at least 10 years and that there is 'no demonstrable need for future rail service.' Application at 2. They also claim that NSR has made no effort to solicit traffic or reinstitute service since acquiring the lines in 1999, and that a survey conducted by the City's Economic Development Specialist indicated no shipper interest in rail service over the lines. More specifically,

35

applicants assert that the University has publicly stated that 'it has no intention of receiving coal by rail' ... and that the Brothers and the Sisters have no current or future need for rail service. Under the circumstances, applicants contend that it would be 'economically infeasible to attempt to reinstate service.' Op. at 4

The record, however, shows that there is a potential for renewed rail operations. There is traffic suitable for rail that could move over the lines, there is a railroad willing to carry that traffic, and there is at least one shipper capable of receiving that traffic. As CLS&SB points out, the university currently receives 80,000 tons of coal annually, has upgraded its coal plant in the face of increasing electrical demands, and is expected to need 100,000 tons of coal annually in the near future. The fact that the University received coal by rail for several decades before switching to delivery by truck from a transloading facility indicates that its plant is capable of handling rail deliveries. ... CLS&SB estimates that 2 weekly trains of 15 cars each would replace the approximately 3,500 truck loads a year (14 truck loads a day 5 days a week) that currently move coal to the University. Thus, there is no doubt that traffic that could use the Lines is available. Op. at 4.

Footnote 13:   Coal can generally be moved more efficiently by rail than by truck, and rail transportation is generally considered less damaging to the environment than truck transportation. Op. at 4.

There is also a carrier willing to carry the traffic over the Lines' track and that track can be readily made adequate to handle the service. Applicants claim that the Lines have been degraded to the point that rail service is no longer feasible, but CLS&SB's efforts to acquire the Lines attest to the lines' potential for rail operations. NSR, the Lines' current owner, notes that the switch connection to its main line was removed sometime after June 1, 2004, but states that it could be reinstalled if there is reason to do so.  NSR further states that it would not be economically prohibitive to rehabilitate the lines to permit rail service to resume for coal deliveries to the University's campus. Op. at 5.

"[W]e are mindful of Congress' intent, as expressed in many statutory provisions, that lines be kept within the rail system where possible. ... That is why the Board has stated in the past that authority for an adverse abandonment would not be granted, even in the absence of current traffic on a line, if there is

36

a reasonable potential for future railroad use.  Op.  at 5-6.  .  ¶18, A-176.

98.  And most recently in *BNSF Railway Company – Abandonment Exemption – In Kootenai County, ID*, STB Docket No.  AB-6 (Sub-No.  468X), Served November 27, 2009, the Board denied a request for an OFA exemption.  In this decision, the Board articulated additional information that must accompany an OFA:

> "[A]ny person seeking to file an OFA must provide not only evidence of its financial responsibility, but should also address **one** or more of the following:  whether there is a demonstrable commercial need for rail service, as manifested by support from shippers or receivers on the line being abandoned or as manifested by other evidence of immediate and significant commercial need;  whether there is community support for continued rail service;  whether acquisition of freight operating rights would interfere with current and planned transit services;  and whether continued rail service is operationally feasible. Op.  at 4.  Emphasis added. ¶19, A-177.

## 22.  PUBLIC USE OF THE LINE / COMPATIBILITY

99.  In the instant case, acquisition of NSR's freight operating rights **would not** interfere with current or planned transit services.  ¶20, A-177.

100.  NSR correctly stated that the MTA only uses that portion of the Line that lies between milepost UU 1.0 (at Wyman Park Drive) and milepost UU 13.0 (on the north side of Warren Road in Cockeysville), and that portion of the Hunt Valley Industrial Track that extends from the CIT at milepost UU 13.0 to the Hunt Valley Mall.  What NSR failed to disclose to the Board is that NSR has the right to use **exclusively** the following portions of the CIT:    From milepost UU 13.0 to milepost UU 15.4;    the Cockeysville Industrial Park Branch that connects to the

37

Hunt Valley Industrial Track a few hundred meters west of milepost UU 13.0; the Public Delivery Branch, which connects to the CIT at milepost UU 13.6;    the northern and eastern branches of the wye at Warren Road;    and the Cockeysville Wye, at milepost UU 13.6 to UU 13.9.  Consequently, the Offerors use of these portions of the Line, since it would be exclusive, would not interfere with the MTA's light rail operations.  The only portion of the Line where the MTA and the Offerors would have to coordinate, would be between North Avenue, at milepost UU 1.0, and Warren Road, at milepost UU 13.0.  This coordination has been spelled out in the Operating Agreement, which assigns to the MTA the right to use this portion of the Line between 5 am and Midnight, and which grants NSR the exclusive right to use this portion of the Line between Midnight and 5 am.  ¶21, A-178.

101.  From 1990, when the MTA began using the Line for light rail purposes, until April, 2005, the Line was mostly single track.  No complaints were filed with the Board suggesting that Conrail's use of the Line was unduly interfering with the MTA's light rail operations.  In April, 2005, the Line was taken out of service to permit the MTA to double track the entire Line.  If using the Line for freight rail purposes for 15 years when the Line was single-tracked, never interfered with the MTA's light rail operations, then using the Line for freight rail purposes, now that the entire Line has been double-tracked, would interfere even less with the MTA's use of the Line.  ¶22, A-17.

## 23.  CONTINUED RAIL SERVICE IS OPERATIONALLY FEASIBLE

102.  NSR, in its Petition, stated:

38

A. "NSR does not maintain the Line." Petition at 30. A-64.

B. "NSR surmises that only minor rehabilitation of the Line and restoration and reconnection of switches would be required to perform freight service over the Line and to ancillary tracks ... ." Petition at 30. A-64. ¶23, A-178.

103. Since only "minor rehabilitation of the Line and restoration and reconnection of switches would be required to perform freight service over the Line and to ancillary tracks," continued rail service is, pursuant to NSR's own statements, "operationally feasible." ¶24, A-179.

## 24. DEMONSTRABLE COMMERCIAL NEED FOR RAIL SERVICE

104. The STB was already aware of some of the potential shippers: See the Protective Order in *James Riffin – §10902 Acquisition and Operation Application – Veneer Spur – In Baltimore County, MD*, STB Finance Docket No. 35246, and the February 22, 2006 Cockeysville Rail Line Shippers Coalition letter, A-354.

105. On **January 5, 2010,** the Offerors filed, under seal, A-373, a list of shippers, and the volume of rail traffic Offerors expected to be tendered. [589 rail cars / year, without including the 4,000 rail cars of Municipal Solid Waste ("**MSW**") traffic that would be generated once the Aberdeen Incinerator came on line.]    And had the STB not abridged the Petitioners' Constitutional Due Process Right to Notice and a reasonable time to Respond, the Petitioners would have provided to the STB, **BEFORE it made its OFA preemption decision,** Verified Statements, **with traffic commitments,** from **8 shippers,** which Verified

39

Statements were filed, under seal, on **April 30, 2010.**  See A-353 to A-364.

## 25. COMMUNITY SUPPORT FOR CONTINUED RAIL SERVICE

106.  As was detailed in the Offerors' Motion for a Protective Order, there is considerable "community support for continued rail service." (8 shippers committed to using rail service, if it were offered.)  See A-353 to A-364.

## 26. THE UTAH DECISION [STB AB-33 (Sub-No. 209) Served Jan. 2, 2008]

107.  On p. 4, A-27, of the STB's April 5, 2010 Decision, the STB cited *Union Pacific Railroad Company – Discontinuance – in Utah County, Utah*, STB Docket No. AB-33 (Sub-No. 209), slip op. at 2-3 (STB served Jan. 2, 2008), as precedent to justify its finding that "Riffin's forecasts for potential freight rail traffic on the CIT are too speculative to be given any significant weight."  Op. at 4, A-27.  The *Utah* case is easily distinguished from this proceeding.

108.  The criteria for abandoning a line is that it is no longer needed for the "public convenience and necessity."  It should be kept in mind that the most important criteria for justifying the discontinuance or abandonment of a line of railroad, is that no one is willing to subsidize the cost of retaining the line of railroad.  (No railroad should be **required** to incur a loss to retain a line of railroad.)  If a line is not being used by shippers, then there is little to no justification for **requiring** a railroad to kept the line active.  As the use of a line increases, the justification for keeping the line increases, (the 'necessity'

component' becomes more important) which increases the likelihood that the carrier will be **required** to keep the line, even though the carrier is losing money on the line. However, no carrier should be **required** to keep a line that is unprofitable. If a line is unprofitable, but is being used by shippers, then those shippers may be required to **subsidize** the operation of the line, to keep it operational.

109. The burden of proof needed to prevent a discontinuance of service is **much greater** than the burden of proof needed to prevent an abandonment, which in turn is **much greater** than the burden of proof needed to justify retaining a line via the OFA procedures.

110. A discontinuance of service does not result in the permanent loss of a line of railroad. It is only temporary. An abandonment results in the permanent loss of a line of railroad. Exempting an abandonment from the OFA procedures is even more difficult to justify, since someone else is willing to provide rail service. This takes away the primary reason for justifying the abandonment of a line of railroad: It cannot be operated profitably. Congress, in enacting 49 U.S.C. 10904, has determined that if someone is willing and able to operate a line, **even at a loss**, then that someone **should be afforded that opportunity**, unless there is an **overriding** need to use the line for some other public purpose, and use of the line would not be compatible with the other public purpose. (A line is a public 'way,' and as such belongs to the 'public.' The public's right to use the 'way' is paramount. Congress has determined that using a 'way' for a line of railroad, is to take precedence over using the 'way' for some other public purpose. To use a rail 'way' for some other public purpose, pursuant to 49 U.S.C. 10905, the STB must

41

first make a finding that the 'way' is "not required for continued rail operations." However, as between using a 'way' for a public trail vs. using the 'way' for a non-public purpose, such as a shopping center, the preference of the carrier, **not** the public, determines which use will occur.  (The Rails to Trails statute, 16 U.S.C. 1247(d), is voluntary.  A carrier is not **required** to use its way for a trail.)

111.  The *Utah* case was a **discontinuance** proceeding.  To prevent the discontinuance, the opponent had a high burden of proof.  The opponent in that proceeding was a mining company, CCMC, which had **not** used the line.  The carrier demonstrated that the potential traffic from CCMC **would not** "generate sufficient revenue to make the segment profitable while still paying for costs and rehabilitation.  UP notes, however, that if concrete traffic materializes, it would consider hauling it if it could do so profitably."  Op. 3.  The STB further noted that "CCMC has not taken the basic step of contacting UP about rates, terms of service, or when the embargoed and overgrown line could be returned to service the mine, which has not generated any traffic in some **30 years**.  Indeed, CCMC **has not made its presence known** to the carrier prior to its filing here."

112.  This proceeding is quite different.  Riffin's desire (demand) for rail service began in 2004, when he purchased a dozen rail cars, contracted with NSR to transport the cars to Cockeysville, and prepaid the freight bill.  NSR transported the cars from Chicago to Baltimore.  When the cars arrived in Baltimore in 2004, NSR refused to take them to Cockeysville, and has continued to adamantly refuse to take them to Cockeysville.

113. As recently as 2005, the CIT was used for freight rail service. The **only** reason freight rail service stopped in October, 2005, was because the MTA **took the entire line out of service for two+ years,** in order to double-track the line. And once the line was put back in service, the existing three shippers **were prohibited** from using the line for the remainder of the 5-year 'subsidy contract' they had signed with the MTA. **The 'subsidy contract' was due to expire in August, 2010. Which is way the STB was in such a hurry to grant NSR's abandonment and OFA exemptions!!**

114. And unlike the *Utah* case, in this proceeding **eight shippers signed verified statements committing to use the CIT.** And unlike the *Utah* case, the Offerors in in this proceeding were attempting to **relieve** the existing carrier, NSR, of its burden of providing service on a **low-profit** line. [Yes, NSR did admit in its previous Notice of Exemption to abandon the Line, that the Line was in fact profitable. Not highly profitable, but profitable. And it was profitable with only 200 cars per year of rail traffic. See *Norfolk Southern Railway Company – Abandonment Exemption – In Baltimore County, MD,* STB Docket No. AB-290 (Sub-No. 237X)].

## 27. CONCLUSION  – OFA EXEMPTION OPPOSITION

115. The Board in the BNSF *Idaho* case, see ¶98, stated that potential OFA offerors must address at least **one** of four criteria. The Offerors **have addressed all four criteria**. Operation of the Line is feasible, since, according to the NSR's Petition, the Line only needs "minor rehabilitation," and since the MTA has the

43

responsibility for maintaining the Line. Freight operations on the Line would cause even less interference with the MTA's light rail operations, since there is no record that Conrail's use of the Line for freight purposes while the Line was single-tracked, caused any operational problems for the MTA, and since the Line was double-tracked in 2005, thereby substantially increasing the Line's capacity. The information contained in the Offerors' Motion for Protective Order demonstrates that there is considerable need for freight rail service, and that there is community support for retaining the Line for rail service. ¶27, A-179.

116. The only reason there has been no traffic on the Line since April, 2005, is because the MTA took the Line out of service for almost two years, because the three shippers on the Line were prohibited from using the Line during the duration of their 5-year 'subsidy contract,' **which expired in August-October, 2010**, and because NSR has adamantly refused to provide Riffin with any rail service, even though he has made repeated demands for service. Now that the subsidies for these three shippers have terminated, one of these shippers, Imerys, has telephoned the Offerors, expressing their desire for a resumption of rail service now that their 'subsidy contract' has expired.

117. In light of the overwhelming evidence in the record that there is a strong desire for rail service in Cockeysville, and that the quantity of rail cars that would be shipped is several times the 200 cars / year that NSR shipped, **at a profit**, the STB's finding that the Line was not needed for continued rail service was **not** supported by 'substantial' evidence and truly was arbitrary, capricious, unreasonable, or unlawful (and actually was all four). Likewise, it was arbitrary, capricious, unreasonable or unlawful for the STB to find that based on the

44

**uncollaborated** representation of the MTA's counsel, there **would be** a conflict between freight and commuter service **so monumental**, that freight rail service **had** to give way to the needs of the MTA's commuter rail.  (The STB found that maintenance of the Line by the MTA would require the **exclusive** use of **both tracks** during the **entire** 5-hour freight operating window, **365 days a year!**)

118.  It also was arbitrary, capricious, unreasonable, or unlawful for the STB to find that "the MSW movements **necessarily** originate on trucks, and the fact that a rail interchange would be needed to complete the delivery of the MSW to the potential incinerator ... we have serious questions about the feasibility of an operation **transloading the MSW from trucks to rail here**." Op. 6, A-29-30. There is **no evidence** in the record indicating that MSW would "necessarily" originate on trucks.  The evidence presented by Riffin indicated that the MSW would originate at the Texas transfer station in Cockeysville, the MSW would be put into containers at the Texas transfer station, and then the containers would be placed onto railcars in Cockeysville.  That does not constitute 'transloading' from truck to railcar.  Most New York City MSW is interchanged several times before reaching its destination in South Carolina or Ohio.  If it is economical to transport MSW from New York City to Ohio or South Carolina, then surely it would be economical to transport MSW from Cockeysville to Aberdeen, MD.  The **primary** reason for railing, rather than trucking MSW from Cockeysville to Aberdeen, **was not** because railing it would be cheaper, but because railing the MSW **would keep 33,000 trucks / year off of a two-lane residential street in Edgewood, MD.**

119.  In the *Notre Dame* case, Op. 7, A-30, the only potential shipper on the line, Notre Dame University, made it clear that **it did not want rail service.**  The

45

STB then determined that because the University **might** change its mind some day in the future, **that was a sufficient showing of continued need for service** to prevent abandonment of the line, [so that the line could be used for another public purpose (a sewer line and a walking trail)].

## 28.  NSR HAS FAILED TO IDENTIFY
## PRECISELY WHERE THE ABANDONMENT ENDS

120.  On page 6 of its Petition for Exemption, NSR states:

> "The Line is located between railroad milepost UU-1.00 (located just north of Wyman Park Drive, formerly Cedar Avenue) and the end of the CIT line south of the bridge at railroad milepost UU-15.44."

121.  The statements "just north of Wyman Park Drive" and "south of the bridge at railroad milepost UU 15.44" are very imprecise.  NSR and the MTA equivocate:  In its Petition, NSR said the Line ends at MP 15.44, even though it also said in its footnote 11, that the Final System Plan only conveyed to MP 15.4.  The MTA said in its April 26, 2010 Reply to Riffin's Petition for Stay, that the Line ends at MP 15.4, which is what the Final System Plan states.  The MTA further stated in its April 26 Reply at p.4:

> "Neither that deed nor any other evidence offered by Riffin specifies that 'Bridge No. 16' means 'the bridge at MP 15.96.' "

122.  The U.S. Court of Appeals, District of Columbia Circuit, recently stated in *Consolidated Rail Corp.  v.  STB*, 571 F.3d 13 (D.C. Cir.  2009), that where the

46

MP 16, rather than to Cockeysville, at MP 15.4.   Since the Western Run bridge was not damaged by Agnes, while the Beaver Dam Run bridge was totally obliterated by Agnes, the "Damaged by 'Agnes' " note was probably referring to the Beaver Dam Run bridge.  Since the purpose of the Final System Plan was to retain those portions of line that were capable of being served by rail on July 26, 1975, and since that portion of the CIT that was located north of Beaver Dam Run was incapable of being served by rail on July 26, 1975 (due to the obliteration of the Beaver Dam Run bridge), it is more probable that the intent was to convey to Conrail only to the south side of Beaver Dam Run, rather than to the south side of Western Run.

125.  The MTA's deed says Conrail conveyed to "the southerly line of Bridge No.  16."  In its April 26 Reply, the MTA says Bridge 16 **is not** located at MP 15.96.  Mr.  Williams' Exhibit C-5, shows a bridge at mileposts 14.85 (York Road), 15.05, 15.16, 15.44, 15.96 and 16.18.  So which bridge is "Bridge 16?"  Besides, if Bridge 16 is located north of MP 15.4, as NSR stated on p.19 of its April 23 Response, "it was not subsequently conveyed to MTA by Conrail."

126.  All of this leads to the conclusion that "an interpretation of the Final System Plan" **is required** to determine the extent of  "the Special Court's conveyance order under 45 U.S.C. 719(e)(2)."  This determination can only be made by the Special Court.  Consequently, the STB is required to either reopen, then reject NSR's Petition, or hold this proceeding in abeyance while the Special Court determines precisely what was conveyed to Conrail by the Final System Plan.  See *Consolidated Rail Corporation – Abandonment Exemption – In Hudson County, NJ*, STB Docket No.  AB-167 (sub-No.  1189X), served April 20, 2010.

48

### 29.   STRANDED SEGMENT:
### COCKEYSVILLE INDUSTRIAL PARK TRACK
### AKA:   HUNT VALLEY INDUSTRIAL TRACK

127.   On p.6 of NSR's Petition, in footnote 5, NSR states that it intends to abandon the Cockeysville Industrial Park Track ("**CIPT**"), which connects to the CIT near MP 13.0.  This line of railroad was acquired by the MTA on **April 25, 1997**.  It would be a line of railroad, since it served at least five shippers.  [Riffin knows of at least five shippers:  McCormick Spices, a freight forwarder, the Stenersen Warehouse, the Michel Warehouse and Noxel.]   At the time the MTA acquired the CIPT, it was a common carrier by rail, having acquired a portion of the Baltimore and Annapolis railroad in 1991.  When, on **August 9, 2001**, the MTA filed to abandon its Baltimore and Annapolis rail line, it made the following statements:

> "MTA and Canton are common carriers by railroad subject to 49 U.S.C. Subtitle IV, Chapter 105."  See AB 590 (Sub-No.  X).

> "MTA acquired this portion of the Line from the B&A Railroad company in 1991 ... ."  P.7, Exhibit E, Historic Report, AB 590 (Sub-No.X).

128.   Since the MTA was a rail carrier when it acquired the CIPT in 1997, it needed authority to acquire this additional line of railroad.  The MTA never sought nor received authority to acquire this additional line of railroad.  When the MTA filed its *Petition for Declaratory Order* on December 22, 2006, STB Finance Docket No. 34975, it only asked the STB to confirm that the MTA's 1990 acquisition of the CIT did not require agency approval under 49 U.S.C.

10901. The MTA **has never sought approval, nor exemption from 49 U.S.C. 10902, to acquire the CIPT.**    The STB's October 9, 2007 Order solely held that the MTA's 1990 acquisition of the CIT did not need prior Commission authority.

129. The MTA became a common carrier in 1991 when it acquired a portion of the B&A rail line.  The MTA never sought nor received an exemption from the requirements of 49 U.S.C. 10902 to acquired an additional line of railroad (the CIPT, acquired in 1997).  Since as a general rule, a person, including a state agency, that acquires an active rail line assumes a common carrier obligation to provide rail service on the line following the change in ownership, unless and until the MTA obtains an exemption from the dictates of 49 U.S.C. 10902, it has a common carrier obligation with regard to the CIPT.  If NSR is permitted to abandon the CIT, the CIPT will no longer be connected to the national rail system.  While NSR will have been granted authority to abandon its operating rights and common carrier obligations on the CIPT, the MTA will still have residual common carrier obligations on the CIPT.  Consequently, **the CIPT will become a stranded segment.**

130. In *Futurex Industries, Inc. v. I.C.C.*, 897 F.2d 866 at 870-873 (7th Cir. 1990), the court stated:

> "We must, of course, be vigilant to detect and restrain the latter phenomenon [segmentation of a line] should it appear."  Quoted in *Caddo Antoine and Little Missouri R. Co. v. U.S.*, 95 F.3d 740 at 748 (8th Cir. 1996).

50

## 30.  THE MTA PLEADINGS
## DO NOT CONSTITUTE 'SUBSTANTIAL EVIDENCE'

131.  The MTA "asserted the abandonment of freight rail service is critical to ensuring the future safety and success of the light rail transit system MTA operates over the Line." Op. at 6.  The STB stated that "the safety of the continued use of the tracks ... [was] an important consideration here." Op. at 7.

132.  **Rebuttal:**  The above statement was made by **counsel** for the MTA.  The statement was hearsay (which is admittable), but **does not** constitute 'substantial evidence,' since it **was not** supported by a sworn (or even an unsworn) statement by a MTA employee.  "[U]nsworn hearsay, ... even when admitted in a nonjudicial hearing is of a low order of probative value." *Jackson v.  U.S.*, 428 F.2d 844, 847 (Court of Claims, 1970).  "However, mere hearsay lacking sufficient assurance of its truthfulness is not substantial evidence to overcome the sworn testimony of a claimant." *McKee v.  U.S.,* 500 F.2d 525, 528 (Court of Claims, 1974).  Sworn statements are "entitled to some consideration, although its weight is necessarily impaired by the fact that the affiant could not be presented for cross-examination, and, therefore, there has been no opportunity to determine his credibility." *U.S. v. I.N.S*, 499 F.2d 918, 921-922 (9th Cir.  1974).  Hearsay evidence, "while admissible, could not form the sole basis of a decision." *Clearfield Cheese Co., v. U.S.,* 308 F.Supp.  1072, 1076 (W.D.Mo., 1969).  "Where there is evidence pro and con, the agency must weigh it and decide in accordance with the preponderance." *Steadman v.  SEC*, 450 U.S. 91, 101, 101 S.Ct.  999, 1007, 67 L.Ed.2d 69 (1981).  "Mere uncorroborated hearsay or rumor does not constitute substantial evidence." *Consolidated Edison Co.  of New York v.  NLRB*, 305 U.S.

51

197, 230, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).

133. The MTA, in its April 26, 2010 Reply, made the following argument:

"The Board's rules specifically permit it to rely on pleadings signed by counsel. 49 C.F.R. §1104.4(a)."

134. 49 CFR 1104.4(a) states:

(a) *Signature of attorney or practitioner.* If a party is represented by a practitioner or an attorney, the original of each paper filed should be signed in ink by the practitioner or attorney, whose address should be stated. The signature of a practitioner or attorney constitutes a certification that the representative:

(1) Has read the pleading, document or paper;
(2) Is authorized to file it;
(3) Believes that there is good ground for the document;
(4) Has not interposed the document for delay;

A pleading, document or paper thus signed need not be verified or accompanied by affidavit **unless required elsewhere in these rules**. (Emphasis added.)

135. 49 CFR 1104.4(a) clearly states that an attorney's signature on a document merely means that (1) he has read it; (2) he is authorized to file it; (3) he believes there is good ground to file the document; and (4) it is not interposed for delay. This is quite similar to FRCP Rule 11 (b). What counsel for the MTA overlooks is the end of the next sentence: "A pleading ... need not be verified ... unless required elsewhere in these rules."

52

136.  All proceedings before the STB are subject to the Administrative
Procedures Act, 5 U.S.C., and in particular to 5 U.S.C. 556 (d).   The statements
made by the MTA's counsel are hearsay.  Hearsay is admittable.  However, as
discussed in ¶ 132 above, unsworn statements do not constitute 'substantial
evidence' when challenged, nor may unsworn statements form the sole basis for a
decision.  The signature of Counsel for the MTA on the pleading does not
magically convert unsworn hearsay into sworn testimony.  If the MTA's argument
were to be adopted by the STB, then there would no longer be any need for any
party represented by counsel to ever submit a verified statement.  Counsel could
throw out 'facts' obtained from unknown, unidentified persons or sources, then
argue they were 'sworn' testimony, merely because counsel signed the pleading.
Allowing this would deny the other party their Due Process Right to confront and
question persons making 'factual' allegations.  There would be no way to test the
reliability or credibility of the 'witness.'  The attorney, in effect, would become the
'witness,' and as such, would be subject to cross examination under oath.  As the
cases cited in ¶132 clearly state, representations made by counsel, even though
unsupported by sworn testimony, are admittable, but do not constitute 'substantial
evidence' when challenged or uncorroborated.


137.  The MTA's counsel's representations that "NSR's requested
abandonment, and the associated exemptions, are critical to ensure the future
safety and success of the light rail transit system MTA operates over the Line,"
MTA January 25, 2010 Reply, p.  2, are unsupported by any sworn statements, and
are **devoid of any particularity** as to **how** or **why**, or **in what way** continued use
of the CIT for freight rail purposes during those hours when the **MTA is not using
the CIT** for light rail purposes, may somehow adversely affect "the safety and

53

success of the light rail system." Not only has Riffin challenged this bald, unsupported, undocumented statement, but the MTA's own statement regarding the effect of double-tracking the entire CIT, conflicts with this statement.   [The CIT was double-tracked to "(1) **increase capacity** on the Line for light rail traffic and (2) **reduce actual and potential temporal conflicts** between freight traffic and light rail traffic."  MTA January 25 Reply at 3.]   And as Riffin pointed out in his Comments, the MTA has never filed any complaints regarding safety issues associated with Conrail's, or NSR's use of the Line for freight purposes **for more than 15 years!**   If there were no safety or capacity issues due to freight use of the Line for 15 years when the Line was single-tracked, when the Line was double-tracked in 2005, the potential for a safety issue was lowered to an even lower probability.   Ultimately, the 'safety issue' becomes just a ruse:   Since the MTA and NSR have separate exclusive operating windows, they never occupy the Line at the same time.  Since freight use of the Line only occurs when the MTA is not using the Line, there can be no 'conflict' between light rail's use of the Line, and the freight carrier's use of the Line.

## 31.  CONCLUSION

138.  For the foregoing reasons, the Petitioners would pray that the court VACATE the April 5, 2010 STB decision that is the subject of the Petition.

Respectfully submitted,

*Lois V. Lowe*

Lois V. Lowe

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on the __25th__ Day of September, 2012, two copies of the foregoing Petitioners' Final Brief, and one copy of the Joint Appendix, was served, either by hand delivery, or by first class mail, postage prepaid, upon the parties before this Court noted below:

*Lois V. Lowe*

Lois V. Lowe

Charles Spitulnik
Kaplan Kirsch
Ste 800
1001 Connecticut Ave NW
Washington, DC 20036

Robert B. Nicholson
Appellate Section – Antitrust Division
Department of Justice – Rm 3224
950 Pennsylvania Ave NE
Washington, DC 20530-0001

Eric Strohmeyer
81 Century
Watchung, NJ 07069

Erik G. Light  – STB
395 E. St. SW
Washington, DC 20423

## CERTIFICATE OF COMPLIANCE WITH RULE 32 (a)

This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this Brief contains __13968__ words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(a)(7)(B) (iii).

This Brief complies with the typeface requirements of Fed.  R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this Brief has been prepared in a proportionally spaced typeface using Word Perfect version 9.0 in 14 point Times New Roman.

*Lois V. Lowe*

Lois V. Lowe, Petitioner

# EXHIBIT   A

## VERBATIM TEXT OF STATUTES CITED

## VERBATIM TEXT OF STATUTES CITED

1st Amendment to the U.S. Government:

> "Congress shall make no law ... abridging ... the right of the people ... to petition the Government for a redress of grievances.

5th Amendment to the U.S. Constitution:

> "No person shall ... be deprived of life, liberty, or property, without due process of law;   nor shall private property be taken for public use, without just compensation."

42 U.S.C. §1983:

> "**§ 1983.  Civil action for deprivation of rights.**
>
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the **deprivation of any rights, privileges, or immunities secured by the Constitution and law, shall be liable to the party injured in an** action at law, suit in equity, or **other proper proceeding for redress,** except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."

49 CFR 1103.4:

> "**1103.4 Initial appearances.**   Practitioners shall file a declaration that they are authorized to represent the particular party on whose behalf they appear at the time of making an initial appearance, in all proceedings.  This requirement can be met by:

(a) Entering the **practitioner's name as the representative** of an applicant in the appropriate space on an application form;

(b) Signing any complaint, petition, protest, reply or other pleading with a designation following **the practitioner's signature** that he is the representative of a party;

(c) Entering an appearance at any hearing on the form provided;  or

(d) Filing a letter with the Secretary of the Board stating that practitioner is authorized to represent a party.  The party represented, their address, and the docket number of the proceeding must also be identified at the time of the initial appearance."


49 CFR 1104.4(a):

(a) *Signature of attorney or practitioner.*  If a party is represented by a practitioner or an attorney, the original of each paper filed should be signed in ink by the practitioner or attorney, whose address should be stated.  The signature of a practitioner or attorney constitutes a certification that the representative:

(1) Has read the pleading, document or paper;

(2) Is authorized to file it;

(3) Believes that there is good ground for the document;

(4) Has not interposed the document for delay;

A pleading, document or paper thus signed need not be verified or accompanied by affidavit **unless required elsewhere in these rules.** (Emphasis added.)

Uniform Commercial Code:

"Section 3-401.  Signature

(1) No person is liable on an instrument unless his signature appears thereon.

(2) A signature is made by use of any name, including any trade or assumed name, upon an instrument, or by any word or mark used in lieu of a written signature.

"Section 3-403.  Signature by authorized representative.

(1) A signature may be made by an agent or other representative, and his
authority to make it may be established as in other cases of
representation.  No particular form of appointment is necessary to
establish such authority."